GAIL SHIFMAN, ESQ., Cal State Bar No. 147334
LAW OFFICE OF GAIL SHIFMAN
2431 Fillmore Street
San Francisco, CA  94115
Telephone:   (415) 551-1500
Facsimile:    (415) 551-1502
Email:         gail@shifmangroup.com

Attorney for Defendant
JORGE WONG

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>JORGE WONG,<br><br>    Defendant. | CASE NO. CR 11-00428 PJH<br><br>**DEFENDANT JORGE WONG'S SENTENCING MEMORANDUM**<br><br>DATE: December 15, 2017<br>TIME: 3:00 p.m.<br>Court: Hon. Phyllis J. Hamilton |

**I. INTRODUCTION**

On December 15, 2017, Defendant Jorge Wong ("Jorge") comes before the Court for sentencing, at which time he will ask the Court to sentence him to one year of probation, 100 hours of community service, and a fine of $4,000.00.

A probationary sentence with community service is justified by Jorge's immediate and truthful acceptance of responsibility upon first being contacted by the FBI in January 2011 (PSR ¶ 12), his early plea of guilty in September 2011, one of the first of the multitude of defendants to enter a guilty plea, his minor role in the offense as reflected in his plea agreement[1] and in the PSR ¶¶ 10 and 21, and his extraordinary cooperation with the government which will result in a government 5K1.1

---

[1] Jorge was one of the only defendants in this scheme to be given a minor role reduction in the government's plea agreements as agreed upon by probation in the PSR.

recommendation of 40% off the low-end of the recommended total offense level of 11 to (8 to 14 months), as well as other circumstances which serve as an independent basis for a downward variance. 18. U.S.C. §3553(a). Jorge asks for a short probationary term with community service work because it has now been just shy of 7 years since the offense occurred.  During these 7 years, Jorge has fully complied with all laws and by doing so has demonstrated that a short term of probation, one year, is sufficient to comply with the purposes of sentencing under 18 U.S.C. § 3553.  Additionally, Jorge has no prior criminal history, was led into this offense by his uncle (Jaime Wong, ("Jaime")) whom he considered a father figure and did not make any money from the "rounds" relating to the offense, which combined with his other characteristics make him a low risk for recidivism, as detailed in the PSR.

## II. PLEA AGREEMENT AND PSR

The plea agreement entered under 11(c)(1)(B) recommends a total adjusted offense level of 11 (8-14 months), a fine of between $4,000 and $40,000, and no restitution. It also includes a government promise to make a motion for a downward departure for Jorge's cooperation under § 5K1.1. Probation recommends a variance from the low-end of the guidelines to a custodial sentence of 4 months, without taking into consideration Jorge's cooperation and a $4,000 fine and no restitution.

There are no unresolved objections to the PSR.

## III. OFFENSE CONDUCT

Jorge worked for his uncle Jaime at Golden Pinnacle which bought and sold homes and offered property management services.  Jorge's job was to conduct property research and attend the Alameda County foreclosure auctions to buy foreclosed properties as instructed by his uncle Jaime.  On one of his first occasions at the public auction when Jorge was bidding on a property as instructed by his u uncle, he was approached by Al Florida and his associates who repeatedly exhorted him to make a payoff to them.  After talking with his uncle over the phone, Jaime authorized the $2,500 payoff.  (PSR ¶ 10.) This was  one of the subjects of Jorge's testimony in the Al Florida trial.  Whenever a solicitation was made to Jorge to participate in a round, he would report this to his uncle over the phone who would then make the decision whether to participate or not in the round. For this reason, Jorge is a minor

2

player in the offense.  (PSR ¶ 11.)

Unlike most of the other defendants, Jorge was truthful when he was first interviewed by the FBI in January, 2011  (PSR ¶ 12) and he was interviewed by the government in person and over the telephone more than 8 times regarding the underlying facts and information of which he was aware.  In addition to testifying at the Al Florida trial, Jorge made himself available to testify at the other trials in the scheme including the Michael Marr trial (the government decided not to call Jorge) and was scheduled to testify in the trial of RaminYeganeh (who ultimately pled guilty).

**IV. PERSONAL BACKGROUND**

Jorge Wong has an unusual background.  He was born in San Francisco and grew up in Alameda County where he has lived his entire life.  He is of Asian descent but his parents were both born in Peru and his first language is Spanish.  Jorge's father attended a military school in Peru and was a "super achiever" who "ran the household" with military precision.  He worked both day and night for a community non-profit and owned a used car sales lot where Jorge was required to work when he was as young as 10 years old.  Jorge was isolated as the family was not close and he was tasked with taking public transportation to escort his sisters home from school each day.  (PSR ¶¶ 37 – 39.)

Jorge had difficulty in school and his high school grade point average was only 0.67.  That he struggled at school created turmoil for him at home because his father believed that school was solely for learning and achieving - - not a place where you went to make friends, go to social events or engage in extracurricular activities.  Though Jorge was good at sports and encouraged by coaches and teachers to participate, his father forbade Jorge from doing so.  Jorge found himself 'grounded' frequently and required to stay at home, never having experienced the opportunity to "be a kid" the way others were allowed to do.  (PSR ¶ 39.)

As a result of the significant tension between Jorge and his father, he went to live with his

grandmother at the age of 16 with whom he was very close but who unfortunately passed away shortly thereafter which caused Jorge deep distress. (PSR ¶ 40.) The first 30 days after she passed away in 2002, and for the only time in his life, Jorge drank alcohol each day, attempting to dull the pain of his loss. (PSR ¶ 48.) It was at this point that he moved in with his uncle, Jaime, who was not only Jorge's father figure but also a best friend and the first person to teach him about real estate in order to get him on a career path. Uncle Jaime was the best man at Jorge's wedding but due to his having led Jorge into this offense, and Jorge's loss of trust in Jaime as a result, Jorge no longer speaks to him. (PSR ¶ 40.)

Jorge is a loving father and husband with a supportive wife and two children with whom he enjoys a close relationship. He is the primary care-person for his son, Leo, age 10, taking him to and from school each day, preparing his lunches and dinners, doing the grocery shopping, cooking and cleaning. Since this offense, Jorge has essentially become the primary care person for his son; he also does the rehabilitation on the couple's rental property. He now practices (and teaches) Jiu Jitsu with his son, who had seizures at birth, initially causing his son to be less coordinated than other children. Thinking it would help his son with his coordination, Jorge enrolled him in the classes but he too found it helpful - - in developing discipline and general well-being. (PSR ¶¶ 43-44.)

Jorge has had no prior arrests or any criminal history other than this offense. (PSR ¶¶ 28-31.)

**V. ARGUMENT**

**A. Jorge's Substantial Assistance Warrants A Downward Departure Motion (5K1.1)**

Jorge's cooperation was substantial and the government is expected to recommend that the court depart 40% below the low-end of the guidelines. We ask the Court to follow the government's downward departure recommendation and to depart from the sentencing guidelines. In addition to Jorge's truthfulness from the inception, his very early plea of guilty, his debriefings and his testimony at trial, Jorge also provided context to the documents provided by Golden Pinnacle, describing hand-

4

written notes, charts and excel spreadsheets. His information regarding the documents was detailed and complete, and aided the government in understanding that the notes, charts and spreadsheets were contemporaneous to the conduct, and referenced specific rounds and the individuals involved in them.

Through no fault of his own, Jorge testified at one trial rather than at two or three trials that he made himself available to testify at based on the government's choices in which evidence they sought to introduce at the Marr trial and the late entry of a guilty plea in the Yaganeh trial.

### B. A downward variance also appropriate for Jorge Wong under 18 U.S.C. § 3553(a)

As the PSR indicates in ¶ 73, and in the Sentencing Recommendations, a variance is appropriate for Jorge based both nature and circumstances of the offense and the history and characteristics of the defendant. Jorge joins in that recommendation and asks that in addition to the granting of a downward departure that the court vary below the guidelines.

#### 1. Nature and Circumstances of the Offense – including minor role and no profits

Jorge Wong came to the courthouse steps in Alameda County to bid in the public auction on foreclosed properties, as instructed by his Uncle Jaime. When he arrived, he was thwarted from purchasing those properties by those already engaged in bid rigging who had developed the private rounds in an effort to control the prices of the sold properties at auction. When he was confronted by Al Florida's people telling him that he had to pay money to buy properties, he called his Uncle Jaime who eventually told him to agree to their demands. In these ways, he was a minor player because he did not make any decisions. He did not come up with this scheme; instead he did as instructed.

And, importantly, unlike the majority of the defendants participating in the scheme, Jorge did not receive any of the profits which instead went to his Uncle Jaime making Jorge's involvement significantly less culpable. Where, as here, the offense level is magnified by the profit and business that went to his Uncle Jaime, a downward variance is appropriate. *United States v. Restrepo,* 936 F.2d 661, 667 (9th Cir. 1991).

**2. History and Characteristics of Defendant - including family circumstances**

Jorge grew up in a home characterized by a strictness that bordered on abandonment. Tensions ensued between Jorge and his father because Jorge did not excel at school and desired to exhibit his talent in other ways beyond scholastics. For his father, this was untenable. The result was that Jorge spent large swaths of his childhood at home isolated from his peers and responsible for the safety of his younger sisters. He was required to work at his father's car lot on the weekends at the age of 10 years. His childhood, while absent from physical abuse, was rife with emotional strife.

At 16 years, to find the needed love and relief, Jorge moved in with his grandmother who died shortly thereafter. Depressed by this loss, Jorge then moved in with his uncle, Jaime. It was with Jaime that Jorge found stability, a best friend, father figure and guiding light. This once positive relationship turned tragic when Jaime instructed Jorge to become involved in this offense and Jorge did not resist. Given Jorge's childhood and history, it is not surprising that he was unable to walk away.

That Jorge ultimately found and married his wife who helped him change his life, his relationship with his family and to focus in a different direction is a testament to Jorge's enduring strength of character. Jorge now is the primary care provider for their 10 year old son and his responsibilities include everything that a care provider does for their child - - cook, clean, shuttle to and from school and extracurricular activities and beyond. These responsibilities would be hindered to great effect if Jorge is required to serve a home confinement sentence. A collateral effect on the family is something the Court may consider as a basis for a downward variance. *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008).

**3. Sentence disparity - 3553(a)(6)**

The Court is well aware of the underlying facts and circumstances of the offense scheme involved in all of the related cases and has now sentenced most of the defendants. It is apparent that

6

the Court has imposed non-custodial sentences to cooperators who are first offenders with home detention of lengths that take into consideration total offense level and government recommendations for departure. In at least two cases, the Court has imposed a sentence of probation that did *not* impose home monitoring (or any other custody alternatives.  Jorge's case is similar to those and we urge the Court not to impose home monitoring.

The Court sentenced Mr. Francoise[2] to 3 years of probation with no confinement or confinement alternative conditions. Mr. Francoise had the same guideline level as Jorge though he did not receive a minor role reduction.  And, unlike Mr. Francoise, Jorge did not receive any of the profits from the scheme.  Similarly, the Court did not impose home monitoring in Mr. Kahan's case[3], where the offense level was two levels higher (13) than Jorge and where he profited from the offense.  Mr. Kahan suffered from serious medical issues which were undoubtedly taken into consideration; however, Jorge's status as the primary caretaker of his 10 year old son provides a similarly compelling reason justifying

While unwarranted sentencing is to be avoided (18. U.S.C. § 3553(a)(6)), courts should not lose sight of the defendant as an individual. *See, United States v. Plouffe*, 436 F.3d 1062, 1063 (9th Cir. 2005). *Pepper v. United States*, 131 S.Ct. 1229, 1239-40.

Jorge's particular circumstances warrant a probationary sentence that does not include home/electronic detention.

**4. Other factors that warrant variance**
**a. Post-offense rehabilitation**

Jorge's offense conduct occurred almost 7 years ago during which time he has remained crime free.  He has been on pre-trial release for more than 6 years without incident. *United States v. Hadash*,

---

[2] 2 U.S. v. Franciose, CR 11-426 PJH, Dkt. 50.

[3] U.S. v. Kahan, CR 13-00412 PJH, Dkt. 47.

408 F.3d 1080, 1084 (8th Cir. 2005); *See*, *United States v. Thompson*, 315 F.3d 1071, 1076 (9th Cir. 2002.)

### b. Aberrant nature of conduct

Jorge has no criminal history. At 42 years old, he has been a law-abiding and productive person his entire life. Given the aberrant nature of this conduct, a variance is appropriate. *United States v. Autrey,* 555 F.3d 864, 874 (9th Cir. 2009 – court can consider defendant's lack of criminal record as a mitigating factor during sentencing); (*United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008); variance based on "isolated mistake" in otherwise long and entirely upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (defendant was a "law abiding citizen, who [did] an incredibly dumb thing.")

### c. Collateral Consequences - Loss of professional licensing and the impact on Jorge

Jorge has a real estate license from the California Department of Realtors.  This felony conviction will likely revoke his license drastically hitting Jorge with the only real business skill he has developed. Moreover, a felony conviction will undoubtedly limit other professional options including working at a bank which Jorge previously did for employment. *United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008 - no abuse of discretion in district court departing downward after considering collateral consequences.) Beyond this, he will be left with the stigma of a felony conviction, which alone is a punishment for someone who has no record. *United States v. Smith*, 683 F.2d 1236, 1240 n. 13 (9th Cir. 1982.)

### d. Extraordinary Acceptance of Responsibility

Cooperation with the government can establish a basis for a variance as part of an 18 U.S.C. § 3553(a) analysis, at the same time as it forms the basis for a departure under § 5K1.1. *United States v. Ressam,* 679 F3d 1069, 1092 (9th Cir. 2012); *United States v. Udo*, 963 F.2d 1318, 1319 (9th Cir. 1992). Jorge's immediate acceptance of responsibility by telling the truth to the FBI agents, his agreement to quickly cooperate with the government, his early plea of guilty in the first round of pleas in September of 2011 are all deserving of consideration for a variance, in addition to the departure the

government will recommend.

Additionally, Jorge is prepared to pay the fine and special assessment immediately following sentencing further evidencing his extraordinary acceptance of responsibility.

### e. Combination of Mitigating Factors

The Ninth Circuit has long held that a combination of factors can together constitute a mitigating circumstance justifying a downward departure or variance. *See United States v. Torres*, 455 Fed. Appx. 780, 781; 2011 U.S. App. LEXIS Cir. 1991). For the same reasons underlying those decisions, this Court is empowered to decide that a concurrent sentence is a reasonable sentence here, based on a *combination* of mitigating factors.

Section 3553(a) directs sentencing courts to consider the defendant's personal characteristics, including his work history, hardships, and family ties and responsibilities. The Ninth Circuit has explicitly held that district courts may consider mitigating factors that the advisory Guidelines have discouraged. *Whitehead,* 532 F.3d 991, 21863 (9 Cir. Oct. 25, 2011)*; United States v. Menyweather*, 447 F.3d 625, 635-636 (9th Cir. 2006) (as amended)*;* Among these "discouraged" factors are highly relevant characteristics that can inform the Court's decision-making here, including: mental and emotional condition; lack of youthful guidance; employment; and family ties and responsibilities. *United States v. Ameline*, 409 F.3d 1073, 1093 (9th Cir. 2005) (*en banc*).  Because these factors are properly considered under 18 U.S.C. § 3553(a) alone and in combination, they are also proper considerations as the Court exercises its discretion under U.S.S.G. § 5G1.3(c) to decide whether making imposing a probationary sentence with community service.

////

////

////

9

**VI. CONCLUSION**

For the foregoing reasons, we ask the Court to sentence Jorge to one year of probation, community service, and a $4,000.00 fine.

DATED: December 11, 2017                                          /s/ Gail Shifman
                                                                  _____
                                                                  GAIL SHIFMAN
                                                                  Attorney for Defendant
                                                                  JORGE WONG

10